DAVID B. SHANIES LAW OFFICE
David B. Shanies
Joel A. Wertheimer
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710 (*Tel*)
(212) 951-1350 (*Fax*)
*david@shanieslaw.com*
*joel@shanieslaw.com*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ARACELIS POLANCO, *as Administrator of the* ESTATE OF LAYLEEN CUBILETTE-POLANCO,

Plaintiff,

— against —

THE CITY OF NEW YORK, COLLEEN VESSELL, CHANZE WILLIAMS, KHALILAH FLEMISTER, and JOHN AND JANE DOES 1-25,

Defendants.

---

Case No. 19-CV-4623

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Aracelis Polanco, as Administrator of the Estate of Layleen Cubilette-Polanco ("Layleen"), files this Complaint against the above-captioned Defendants and alleges as follows:

## NATURE OF THE ACTION

1. Layleen was just 27-years-old when she died on June 7, 2019 at the Rose M. Singer Center on Rikers Island. She should be alive today.

2. Layleen was a Dominican-American, transgender woman, who lived with epilepsy and schizophrenia.

1

3. People incarcerated at Rikers are constantly subjected to violence, both from correction officers and other inmates.

4. People incarcerated at Rikers are routinely denied necessary medical care and proper supervision, including people who, like Layleen, have conditions presenting a high risk of death or serious bodily injury.

5. People incarcerated at Rikers are frequently improperly placed in solitary confinement, including those who, like Layleen, have serious medical and/or psychiatric conditions that should render them ineligible for placement in Punitive Segregation or Restricted Housing Units.

6. In particular, DOC regularly places transgender inmates in solitary confinement, often for minor alleged infractions and in some cases for no legitimate reason at all.

7. According to former DOC mental health staff, DOC personnel routinely place inmates in solitary for purely pretextual reasons, to make use of the bed space in solitary housing units.

8. These perennial problems have been brought to the City's and DOC's attention again and again, including by the United States Department of Justice; the Independent Commission on New York City Criminal Justice and Incarceration Reform; and countless lawsuits, news reports, studies, letters, and other communications.

9. Most people incarcerated on Rikers are, like Layleen, presumptively innocent, held in jail awaiting trial and unable to meet bail. Layleen was incarcerated because she was unable to meet $500 bail.

10. Many incarcerated people are attacked and end up in preventable altercations and then placed in solitary confinement (sometimes called punitive or restricted housing), where they are kept in cells for more than 20 hours a day.

11. Conditions on Rikers Island are so bad that Homer Venters, the former Medical Director for New York City jails, recently said that "closing Rikers is absolutely necessary.  It's not sufficient to transform the criminal justice system in New York City to become more humane, but it's necessary."

12. Numerous former DOC employees who held supervisory positions have documented the persistent brutality and mistreatment of inmates on Rikers Island, including Mr. Venters's book, *Life and Death in Rikers Island* (published 2019) and former Rikers assistant mental health chief Mary Buser's book, *Lockdown on Rikers: Shocking Stories of Abuse and Injustice at New York's Notorious Jail* (published 2015).

13. Layleen is dead because the City of New York and its DOC and Health + Hospitals / Correctional Health Services ("CHS") personnel failed to provide her safe housing, adequate medical care, and proper accommodation for her disabilities.

14. Plaintiff brings this action under the Fourteenth Amendment of the Constitution, 42 U.S.C. § 1983, and Section II of the Americans with Disabilities Act ("ADA"), seeking justice for Layleen and damages from the City of New York and its employees for their violations of her rights.

## JURISDICTION AND VENUE

15. This action arises under 42 U.S.C. §§ 1983 and 1988 and 42 U.S.C. § 12131(2).

16. Jurisdiction lies in this Court under its federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and 1343.

17. Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's claims arose in the State of New York, all Defendants are residents of the State of New York, and all named Defendants reside in the Eastern District of New York.

## PARTIES

18. Layleen Cubilette-Polanco was an individual residing in Yonkers, New York, who died while incarcerated at the Rose M. Singer Center on Rikers Island.

19. Plaintiff Arecelis Polanco is Layleen's mother, next-of-kin, and the Administrator of Layleen's Estate. She is an individual residing in Yonkers, New York.

20. Defendant City of New York is a municipality and a political subdivision of the State of New York, existing by virtue of the laws of the State of

4

New York. Defendant City of New York is and was at all relevant times responsible for the policies, customs, and practices of the DOC and CHS.

21. Defendant Chanze Williams was at all relevant times a municipal official employed by DOC, residing in Richmond County, New York, acting under color of state law, and responsible for the care of those incarcerated at the Rose M. Singer Center, including Layleen.

22. Defendant Khalilah Flemister was at all relevant times a municipal official employed by DOC, residing in Kings County, New York, acting under color of state law, and responsible for the care of those incarcerated at the Rose M. Singer Center, including Layleen.

23. Defendant Colleen Vessell was at all relevant times a municipal official employed by Health + Hospitals / Correctional Health Services, residing in Kings County, New York, acting under color of state law, and responsible for Layleen's medical care.

24. John and Jane Does 1-25 are correction officers, captains, deputy wardens, and jail medical staff, acting under color of state law, and responsible for the care of those incarcerated at the Rose M. Singer Center, including Layleen.

## GENERAL ALLEGATIONS

25. Layleen Cubilette-Polanco was a transgender woman, born in the Dominican Republic, who immigrated to the United States as a child and became a naturalized citizen.

26. Layleen was arrested on April 13, 2019, for misdemeanor charges. She was sent to the Rose M. Singer Center on Rikers Island.

27. Layleen lived with schizophrenia and epilepsy, both of which are treatable conditions, but which substantially limited a number of Layleen's major life activities and required heightened supervision because of the serious risks they present, including the heightened risk of suicide and death from seizure-related complications.

28. The DOC, CHS, and Individual Defendants were aware that Layleen suffered from both conditions.

29. From on or about May 16, 2019 until on or about May 24, 2019, Layleen was taken to Elmhurst Hospital while in DOC custody, where she was treated for one or more of the medical conditions described above.

30. Layleen was prescribed an anti-seizure medication to be administered twice daily.

31. In the months preceding her death, Layleen had multiple seizures while in DOC custody.

32. Layleen's epilepsy substantially limited her neurological functions and impeded other major life activities, including self-care, speaking, communicating, concentrating, thinking, and breathing.

33. Layleen's schizophrenia substantially limited her major life activities, including self-care, sleeping, speaking, concentrating, thinking, communicating, and working.

34. DOC regulations purport to forbid punitive segregation from being used on an inmate with a serious medical or psychiatric condition.

35. Epilepsy is a serious medical condition.

36. Schizophrenia is a serious psychiatric condition.

37. On or about May 30, 2019, Layleen was sentenced to twenty days in punitive segregation for an alleged disciplinary infraction. Layleen was placed in the Central Punitive Segregation Unit ("CPSU") at the Rose M. Singer Center.

38. On or about May 30, 2019, Defendant Flemister authorized Layleen's placement in punitive segregation. Defendant Flemister knew that Layleen lived with epilepsy and schizophrenia, and was at heightened risk of death or serious physical harm if placed in segregation.

39. On May 30, 2019, Defendant Vessell, a physician, completed a form entitled "PSEG [Punitive Segregation] Review." Defendant Vessell authorized Layleen's placement in punitive segregation despite her epilepsy, writing that the epilepsy presented "no acute contraindication to the RHU [Restricted Housing Unit]." Defendant Vessell knew that Layleen lived with epilepsy and schizophrenia, and was at heightened risk of death or serious physical harm if placed in segregation.

40. At or around the time of her placement in CPSU, Layleen had suffered injuries to her head and face. DOC and CHS personnel and the Defendants herein were aware of those injuries.

41. Layleen did not receive medical care for any head injury and did not receive any precautionary screening for the potential effects of head trauma on her epilepsy.

42. Inmates in restricted housing, often including those with serious physical and mental health issues, are isolated in their cells for nearly all of their waking hours. Layleen was treated accordingly, and regularly was left alone in a cell for many hours at a time.

43. Even when she received the amount of time out of her cell that she was supposed to receive – which frequently did not happen – Layleen spent the vast majority of her life in CPSU in solitary confinement, meaning that she was locked in a small cell by herself.

44. On many days in CPSU, Layleen received two hours or less outside of her cell.

45. On June 7, 2019, at or around 1:00 p.m., correction officers, including Defendant Chanze Williams and Jane Doe Number 1, went to Layleen's cell, where she had been locked in for an hour or more.

46. The officers knocked on the cell door, but Layleen was unresponsive.

47. The officers took no action to get Layleen medical attention (nor to determine whether she needed medical attention).

48. Instead, the officers left Layleen alone in the cell.

49. Another inmate reported hearing one of the officers remark that Layleen was "asleep."

50. The officers ignored the obvious risk that Layleen, who lived with epilepsy, suffered frequent seizures, and recently suffered head trauma, needed medical attention and could suffer serious injury or death without intervention.

51. At or around 3:00 p.m., two correction officers and a captain went to Layleen's cell. Layleen remained unresponsive.

52. The officers finally entered the cell and found Layleen dead. She had been dead so long that first responders found her body cold to the touch.

53. Epileptics need consistent, 24-hour monitoring because of the risk of death from suffocation and other hazards seizures cause.

54. Inmates placed in restricted housing and solitary confinement do not receive such constant monitoring, and instead are ignored and left in their cells for hours at a time.

55. Layleen was no different. She was checked on infrequently by the Defendants and, when she was checked on, her condition was ignored, even when she was found non-responsive.

## Epilepsy

56. Epilepsy is a condition that affects millions of people worldwide.

57. Inability to breathe during and/or after a seizure is a common and well-known risk factor facing people with epilepsy.

58. One of the primary instructions for rendering first aid to someone who has suffered a seizure is to roll them onto their side. Then, people are instructed to aid a person experiencing a seizure by raising their chin to tilt their head back slightly; opening their airway to help them breathe; check that nothing is blocking their airway; and, if there is an obstruction, remove it.

59. Placing inmates with epilepsy in seclusion, isolated, restricted, or solitary confinement is very dangerous. Having a seizure while in seclusion puts an unobserved inmate with epilepsy at far greater risk of injury and death.

60. An inmate may experience a fall from a seizure and suffer trauma, or have a seizure while sleeping and suffocate, especially if the inmate is not adequately monitored.

61. The Individual Defendants were aware of these risks and committed the acts and omissions described herein in spite of them.

### *Monell* **Allegations**

62. Between 2010 and 2016, there were more than 100 deaths in New York City jails. Former Medical Director Venters found that up to twenty percent of those deaths each year were "jail-attributable deaths."

63. Nowhere is the risk to inmates' safety greater than in solitary confinement (alternatively named "punitive segregation" or "restricted housing" by correction officials who prefer not to call it solitary confinement).

64. Dr. Venters identified solitary confinement as "one of the most dramatic health risks of incarceration," noting that the practice can and has resulted in "preventable death."

65. Dr. Venters has reported that when he and other jail medical providers raised the "health risks" of solitary confinement with the City's "policy makers," their concerns were brushed aside.

66. Dr. Venters delivered to City policy makers his medical opinion that solitary confinement was "harmful for our patients and that we should eliminate this practice for our patients with mental illness and adolescents and severely limit it for all others." The Medical Director's recommendation did not result in policy changes.

67. Numerous published studies and widely circulated medical journals concluded that placing individuals with serious mental illness in solitary confinement presented serious and unacceptable health risks.

68. At all relevant times, the City's policy makers were aware of these reported risks.

69. Nevertheless, the City has continued, as a matter of policy, custom, and practice, to place individuals with serious mental illnesses and serious medical problems in solitary confinement, including Layleen.

70. Just one month before Layleen died, the City entered into a multi-million dollar settlement over the 2014 death of Rolando Perez in DOC custody.

71. Perez died two days after being put in solitary confinement. He had suffered from epilepsy since he was a teen and relied on medications to control it.

72. Given his epilepsy, Perez never should have been placed in solitary confinement; but because DOC's solitary confinement policy permits it, Perez was placed in segregation, where he died from complications of a seizure.

73. In September 2016, the City entered into a multi-million dollar settlement with the family of Victor Woods.

74. Woods also suffered from seizures while in DOC custody. He died from complications of a seizure while correction officers failed to seek medical attention for him.

75. In September 2016, the City settled a multi-million dollar lawsuit with the family of Bradley Ballard. Mr. Ballard was taken into custody in June 2013 on a parole violation for his failure to report an address change. Mr. Ballard was deprived of medication for his diabetes and schizophrenia.

76. At one point during his incarceration, he was sent to the psychiatric prison ward at Bellevue Hospital Center, where he stayed for 38 days before being sent back to the mental health unit at Rikers.

77. On September 4, 2016, Ballard was locked in his cell as punishment for an alleged infraction, where he was denied food, water, and medical and mental health care. Seven days later, Ballard was found dead in his cell. His death was ruled a homicide.

78. These and many other cases have put the City and DOC on notice that putting people with physical and mental disabilities into punitive segregation, without monitoring, creates a risk of death or serious injury.

79. In December 2014, the Prisoners' Rights project of the Legal Aid Society submitted a report to the City as testimony, available at http://bit.ly/deathisinsolitary, providing extensive information about the dangers facing inmates confined in restricted or segregation housing, including the heightened dangers facing inmates with serious medical and/or psychiatric problems.

80. No adequate remedial action has been put in place to rectify the dangers faced by disabled inmates in punitive segregation.

81. Prior to Layleen's death, no officer responsible for formulating the policies allowing inmates with serious medical and/or psychiatric problems to be placed in punitive segregation had been suspended, fired, or disciplined. Nor had any officer responsible for placing inmates with serious medical and/or psychiatric problems to be placed in punitive segregation been suspended, fired, or disciplined.

82. The City turns a blind eye to correction officers who violate

commitments it has made to the Federal government and its citizens.

83. The failure to discipline correction officers for criminal and unconstitutional actions leads to the lawless and dangerous actions of its employees.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983, Fourteenth Amendment to the United States Constitution**

*Against Defendants Vessell, Williams, Flemister, and John and Jane Does 1-25*

84. Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

85. The Individual Defendants were at all relevant times New York City employees responsible for Layleen's custody and care.

86. The Individual Defendants knew, were deliberately indifferent to, and/or recklessly disregarded the fact that that Layleen faced a substantial risk of serious harm if she was left unmonitored for even 30 minutes at a time.

87. The acts and omissions of the Individual Defendants, which caused Layleen to choke to death and die alone in her cell, were deliberately indifferent to a known and substantial risk of serious injury to her.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983, Fourteenth Amendment to the United States Constitution**

*Against Defendant City of New York*

88. Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

89. Defendant City was put on notice of the risk of inaction by the numerous deaths to mentally ill and disabled inmates in solitary confinement, as evidenced by the numerous multi-million dollar settlements the City entered into arising out of deaths of inmates in solitary and punitive segregation.

90. Correction officers and DOC employees repeatedly ignore the medical needs of inmates placed in punitive segregation, leading to their death.

91. Correction officers and DOC employees are not disciplined for their knowing use of punitive segregation on disabled inmates, their failure to monitor disabled inmates in punitive segregation when medically necessary, and their complete disregard for the medical needs of inmates in punitive segregation.

92. The City, by its failure to discipline, supervise, and train its employees while on notice of the risks faced by inmates with medical needs in punitive segregation, was deliberately indifferent to the constitutional rights of inmates.

93. The City exhibited deliberate indifference because it failed to act when the need for more or better supervision to protect against constitutional

15

violations was obvious. The City tacitly authorized the pattern of misconduct witnessed here. Nothing was done to investigate or forestall such incidents.

94. The City's deliberate indifference to the constitutional rights of inmates with serious medical needs in punitive segregation caused the death of Layleen Polanco.

### THIRD CAUSE OF ACTION

**Claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.***

Refusal to Provide a Reasonable Accommodation with Deliberate Indifference to Serious Medical Needs and Inmate Health and Safety

*Against All Defendants*

95. Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

96. Congress enacted the Americans with Disabilities Act "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

97. Due to the severe seizures she regularly suffered, Ms. Cubilette-Polanco disabled as defined under 42 U.S.C. § 12102(1)(A), because she suffered a neurological impairment that substantially limited one or more of her

16

major life activities, including, but not limited to, her ability to walk, eat, work, communicate, and comprehend her surroundings.  Epilepsy, a condition characterized by seizures, has been determined to be a condition that "will, at minimum, substantially limit [a] major life activit[y]" because "epilepsy substantially limits neurological function" and will "virtually always be found to impose a substantial limitation on a major life activity."  29 C.F.R. § 1630.2(j)(3)(ii-iii).

98. Plaintiff was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2): "Qualified individual" means an individual with a disability who meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the entity (with or without regard to any auxiliary aids or modifications).

99. She had a right not to be discriminated against by the City of New York on the basis of her disability.  The violations of the Act alleged herein were committed by the other Defendants while acting within the course and scope of their employment and/or agency of the City of New York. The City of New York is liable for the actions of those agents and employees.

100. The City of New York and its agents were aware of the need for reasonable accommodation for her seizures, because they were aware of anti-convulsant medication taken by Ms. Cubilette-Polanco and provided anti-convulsant medication to her.

101. The City of New York and its agents and employees acted intentionally and/or with deliberate indifference to Ms. Polanco's need for a reasonable accommodation by placing her in the restricted housing unit, where she could not be readily observed and, in the event of a seizure, could be given medical care.

102. Layleen suffered a seizure while in her cell and died as a direct and proximate result of the City's, its agents', and its employees' refusal to provide Layleen with a reasonable accommodation for her disability

103. Had she been reasonably accommodated, she would have been detained in a readily observable cell, and would be alive.

104. As a result of the refusal to provide her with a reasonable accommodation for her disability, Ms. Cubilette-Polanco suffered discrimination, unequal treatment, exclusion and violations of her rights under the laws of the United States, and she suffered the serious injuries alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Aracelis Polanco, on behalf of the Estate of Layleen Cubilette-Polanco, demands judgment against the above-captioned Defendants as follows:

a. For compensatory damages in an amount to be determined at trial;

b. For punitive damages against the individual defendants in an amount to be determined at trial;

c. For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and other applicable laws;

      d.      For pre- and post-judgment interest as allowed by law; and

      e.      For such other relief as this Court deems just and proper.

Dated: August 8, 2019
New York, New York

DAVID B. SHANIES LAW OFFICE

By: *David B. Shanies* (signature)

David B. Shanies
Joel A. Wertheimer
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710 (*Tel*)
(212) 951-1350 (*Fax*)
*david@shanieslaw.com*
*joel@shanieslaw.com*

*Attorneys for Plaintiff Arecelis Polanco*
*Administrator, Estate of Layleen Cubilette-Polanco*